754 S.E.2d 862

**Clarence ROBINSON, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

Appellate Case No. 2011–182548.

No. 27357.

Supreme Court of South Carolina.

Heard Oct. 1, 2013.

Decided Feb. 26, 2014.

170

172

174

Appellate Defender LaNelle Cantey DuRant, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Julie Kate Keeney, all of Columbia, and Scarlett Anne Wilson, of Charleston, for Respondent.

Chief Justice TOAL.

Clarence Robinson (Petitioner) appeals his conviction for armed robbery and possession of a firearm during the commission of a violent crime, claiming the trial court erred in finding the police had a reasonable, articulable suspicion to stop him and search the vehicle that he was driving. We affirm.

### FACTS/PROCEDURAL BACKGROUND

On February 26, 2008, at approximately 9:45 p.m., four men entered Benders Bar and Grill in the West Ashley area of Charleston, South Carolina, and robbed the patrons and the establishment, stealing approximately $875. Each man carried a gun and covered his face with some sort of fabric fashioned into a bandana. The men made the patrons and

staff lie face-down during the robbery. As a result, the witnesses could not describe their facial features and were only able to identify the general coloring of their clothing glimpsed in the seconds between the men's entry and their demand for patrons to "get down." [1]

The men escaped out the front door of Benders, although no witness could attest whether they left in a vehicle or on foot. The police arrived at 9:51 p.m., within thirty-one seconds of the initial 911 call and two to three minutes of the robbery itself. The responding officer briefly interviewed the patrons and staff and issued an initial "be on the lookout" (BOLO) description to other patrolling officers via the police radio, describing the suspects as four armed African–American men, approximately twenty years old, and wearing all-black clothing.

At 10:06 p.m., a police officer spotted a parked vehicle with its lights off in the darkened, fenced-in parking lot of a closed church and decided to investigate, pulling his patrol car behind the parked vehicle and blocking it in. The officer was aware of the BOLO but testified that the BOLO did not include a description of the getaway vehicle, so he initially "thought maybe it was a couple that was parked there, or somebody from the church left a car there." He called in the car's license plate to dispatch and then approached the car. At that point, he noticed that there were four men in the vehicle who matched the approximate description of the BOLO—the correct number of men, the correct race, the correct age, and the correct approximate clothing color. Further, the testimony at trial established that the church is located within a short drive of Benders. The officer asked the driver, Petitioner, for his driver's license and walked back to his patrol vehicle and requested backup. The officer claimed that he called in the license plate and requested the driver's license to check for

---

1. However, several witnesses provided detailed information about the men's footwear because their feet were in their line of sight during the robbery. For example, one witness stated that two of the men wore black Timberland boots and black and white high-top Nike tennis shoes, known as "Willie-D's." Another witness remembered one of the men wearing red and black Air Jordan tennis shoes with white shoelaces. According to the witness, Air Jordan tennis shoes are only made with a red and black color scheme, and black shoelaces are standard. Therefore, the non-standard white shoelaces caught his attention.

outstanding warrants, which involved calling a police dispatcher and "run[ning] it with them." He "did not do anything [further] until the backup cars came," including returning the driver's license.

At 10:09 p.m., two backup police officers arrived. These two officers also received the BOLO alert and knew there were four robbery suspects at large. One backup officer testified:

> When I first pulled up we were in an unmarked vehicle. So I think they didn't know we were there yet. They were talking to just [the first officer] and seemed sort of relaxed.
>
> And it seems like when I approached and came around [one side of the vehicle], and my partner went around the other side [of the vehicle], everyone became really nervous and silent. And all four of them looked straight forward.

The officers found the men's behavior suspicious. Therefore, the officers requested Petitioner exit the vehicle so they could pat him down for weapons. Next, they requested each passenger exit the vehicle, one-at-a-time, and patted each down for weapons. While the police found no weapons on any of the men, when the final passenger—seated in the rear passenger-side of the vehicle—exited the vehicle at the officers' request, a .22 caliber revolver with its serial number removed became immediately visible on the floorboard.[2] Because none of the four men would admit who owned the gun, the officers arrested all four, including Petitioner, and read them their *Miranda*[3] rights. At this point, several other officers responded to the scene to help secure the four suspects and search the vehicle.

At first, the officers detained the four suspects near the vehicle's trunk while other officers searched the car.[4] The

---

2. South Carolina law criminalizes possession of a handgun with its serial number removed or obliterated. S.C.Code Ann. § 16–23–30(C) (2013).

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. The initial search of the passenger area of the vehicle revealed a pair of black gloves, a yellow Nike knit hat, and a piece of red cloth tied into a bandana.

trunk was locked, and the suspects claimed to be unaware of the key's location. The owner of the car (not Petitioner) stood with his back to the trunk while talking to the officers; however, every time an officer searched near or touched the back seat, the suspect "would turn his head around extremely quickly just to see what was going on." Once the officer stopped searching that area, "he would act completely normal again." After this pattern repeated several times, the officers noticed a gap between the top of the backseat and the flat paneling between the seat and the back windshield. The officers pulled the seat forward slightly to peer into the trunk and saw three more guns in an area that would have been accessible to the suspects had they still been in the vehicle.[5]

Petitioner and his three co-defendants proceeded to trial for armed robbery and possession of a firearm during the commission of a violent crime. At trial, Petitioner and his co-defendants moved to suppress the guns and all other evidence found from the search of the vehicle based on their claims that the police lacked a reasonable suspicion to stop them initially and that, even if the police did have a reasonable suspicion, the warrantless search of the car's trunk exceeded the scope of their permissible authority. The trial court, relying in part on *State v. Culbreath,* 300 S.C. 232, 387 S.E.2d 255 (1990), *abrogated on other grounds by Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), admitted all of the evidence, finding that (1) the officer had a reasonable suspicion that criminal activity was afoot when he stopped the car initially and (2) several exceptions to the warrant requirement justified the warrantless search.[6] Ultimately, the jury found

---

5. The officers also found a black hooded sweatshirt, two pairs of black gloves, a pair of clear latex gloves, a black and white knit hat, a black knit hat, a pair of black and red Nike Air Force One tennis shoes, and a piece of gray cloth tied into a bandana. The officers then escorted the manager at Benders—the same man who had identified the shoes of one of the men—to the parking lot to attempt to make a positive identification. The manager identified the black and red Air Jordan tennis shoes with the white laces as those on the car-owner's feet. Similarly, Petitioner wore black and white Willie–D's that another bar patron had described. A third suspect wore black Timberland boots described by the same patron. Between the four suspects, $870 was recovered.

6. Specifically, the trial court found the search was justified by the plain view exception with respect to the gun with the obliterated serial

Petitioner and his co-defendants guilty, and the trial court sentenced each man to twelve years for the armed robbery and five years for the possession of a firearm during the commission of a violent crime, the sentences to run concurrently.

Petitioner notified his trial counsel of his desire to appeal; however, his trial counsel miscalculated the time for appeal. Therefore, the court of appeals dismissed Petitioner's direct appeal as untimely.

Petitioner filed a post-conviction relief (PCR) application, including a request for belated review of his direct appeal issues pursuant to *White v. State*, 263 S.C. 110, 208 S.E.2d 35 (1974). The PCR court denied his claim for ineffective assistance of counsel, finding that Petitioner failed to prove either prong of the two-prong *Strickland*[7] test. However, the PCR court found that Petitioner had not knowingly waived his right to a direct appeal under *White v. State.*

Petitioner sought a writ of certiorari. This Court granted the writ of certiorari pursuant to Rule 243, SCACR, and *Davis v. State*, 288 S.C. 290, 342 S.E.2d 60 (1986).

### ISSUES

I. Whether the trial court erred in denying Petitioner's motion to suppress based on its finding that the police had a reasonable suspicion of criminal activity to justify detaining Petitioner.

II. Whether the trial court erred in denying Petitioner's motion to suppress based on its finding that several exceptions to the warrant requirement justified the warrantless search.

### STANDARD OF REVIEW

 On appeal from a motion to suppress on Fourth Amendment grounds, this Court applies a deferential standard

---

number, and either by the search incident to a lawful arrest exception, the automobile search exception, or the inventory search exception with respect to the three guns and other evidence found in the trunk.

7. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

of review and will reverse only if there is clear error. *State v. Tindall*, 388 S.C. 518, 520, 698 S.E.2d 203, 205 (2010); *State v. Brockman*, 339 S.C. 57, 66, 528 S.E.2d 661, 666 (2000) ("Therefore, we will review the trial court's ruling like any other factual finding and reverse if there is clear error. We will affirm if there is *any evidence* to support the ruling." (emphasis added)). However, this Court is not barred from conducting its own review of the record to determine whether the trial judge's decision is supported by the evidence. *Tindall*, 388 S.C. at 520, 698 S.E.2d at 205.

## ANALYSIS

### I. Reasonable Suspicion

Petitioner argues that the trial court erred in failing to suppress the evidence under the Fourth Amendment because the officer did not possess reasonable suspicion to detain Petitioner. Specifically, Petitioner contends that the officer "did not provide any specific facts as to why there was an articulable suspicion to detain" Petitioner and his co-defendants other than "there might have been a couple parked at the site in the car." Therefore, Petitioner argues that once the driver's license and license plate came back free of outstanding warrants, there was no indication of criminal activity, so the officer should have released Petitioner, and any further action to detain Petitioner or search the vehicle exceeded the scope of a valid stop. We disagree.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This guarantee "protects against unreasonable searches and seizures, including seizures that only involve a brief detention." *State v. Pichardo*, 367 S.C. 84, 97, 623 S.E.2d 840, 847 (Ct.App.2005) (citing *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). A person has been seized within the meaning of the Fourth Amendment at the point in time when, in light of all the circumstances surrounding an incident, a reasonable person would have believed that he was not free to leave. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870; *see also Pichardo*, 367 S.C. at 97, 623 S.E.2d at 847 ("Temporary detention of individ-

uals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment.").

In general, a police officer "may [ ] stop and briefly detain a vehicle if they have a reasonable suspicion that the occupants are involved in criminal activity." *Pichardo*, 367 S.C. at 97–98, 623 S.E.2d at 847. Reasonable suspicion is something more than an "inchoate and unparticularized suspicion" or hunch. *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Instead, looking at the totality of the circumstances, reasonable suspicion requires there be an objective, specific basis for suspecting the person stopped of criminal activity.[8] *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The police officer may make reasonable inferences regarding the criminality of a situation in light of his experience, but he must be able to point to articulable facts that, in conjunction with his inferences, "reasonably warrant" the intrusion. *Terry*, 392 U.S. at 21, 27, 88 S.Ct. 1868.

If, during the stop of the vehicle, the officer's suspicions are confirmed or further aroused—even if for a different reason than he initiated the stop—the stop may be prolonged, and the scope of the detention enlarged as circumstances require. *Culbreath*, 300 S.C. at 235, 387 S.E.2d at 257; *see also United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (stating that once police officers detained the defendant, they "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop"); *State v. Blassingame*, 338 S.C. 240, 525 S.E.2d 535 (Ct.App. 1999) (holding that an officer had reasonable suspicion to stop the defendant based on his presence near an abandoned truck, which had been carjacked, and his appearance, which closely matched that of the carjacking suspect, and could briefly detain him for investigative purposes).

---

8. We respectfully disagree with the concurrence that our opinion implies that reasonable suspicion is "subjective rather than objective judgment." Rather, we explicitly state the opposite in the previous sentence.

██ In the instant case, the police officer seized Petitioner within the meaning of the Fourth Amendment at the time the officer pulled up behind the vehicle Petitioner was driving, blocking the vehicle in and preventing it from driving away. At that point, a reasonable person in Petitioner's position would not have felt free to leave. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. Because the seizure began at that point, the requisite reasonable suspicion likewise must have been present at the same time.

██ When he pulled up behind the car, the officer knew the following: (1) there was a parked car in a closed and darkened church parking lot on a Tuesday night; (2) the car was behind a fence with its lights off; (3) the car had no reason to be within the fence at that time of night when the church was closed; and (4) the area where the car was parked was not readily open to the public. From these facts, the officer inferred that a couple might be parked in the vehicle "necking" on church grounds, a potential misdemeanor under section 16–11–760 of the South Carolina Code. We find these facts give rise to a reasonable suspicion that potential criminal activity was afoot and that the stop was therefore justified at that point based solely on the officer's assumption that there was a couple "necking" in the car.

██ When the officer approached the vehicle and found four young African–American men dressed in dark-colored clothing inside, he obtained additional information that further aroused his reasonable suspicions. In addition to the facts listed above, he knew that: (1) the police were looking for four African–American men in their twenties who robbed a bar within twenty minutes of the officer's encounter with the men; (2) the bar was in close proximity to the church parking lot; (3) there were four young men in the vehicle who matched the approximate description of the BOLO—the correct number of men, the correct race, the correct age, and the correct approximate clothing color—and (4) there were four potential suspects and only one of him.[9] These new facts changed the

---

9. Although the officer did not explicitly connect his awareness of the BOLO and the ongoing search for the robbers with the actions he took after initially approaching Petitioner and his co-defendants in the car, his testimony and actions raise a *strong* inference that he did so, and we

officer's suspicions regarding what type of potential criminal activity the vehicle's occupants could be involved in, which consequently justified the officer enlarging the scope of his detention to investigate his new suspicions. *See Culbreath*, 300 S.C. at 235, 387 S.E.2d at 257. The enlarged scope of the stop permitted calling for backup so that the officer would not be so badly outnumbered prior to questioning the men about their involvement in the armed robbery at Benders. *See Hensley*, 469 U.S. at 235, 105 S.Ct. 675.

Finally, when the two backup officers arrived, both of whom were aware of the BOLO description and that the occupants of the vehicle could potentially be involved in the robbery, the four men's sudden "nervous[ness] and silen[ce]" and their "look[ing] straight forward" further aroused the officers' suspicions. At that point, there was a reasonable suspicion that the four vehicle occupants were the four armed robbers described in the BOLO. Thus, removing the men from the car and patting them down for weapons to ensure the officers' safety was eminently reasonable. *See id.* Further, once the last co-defendant stepped out of the vehicle and the altered gun became visible on the floorboard, as explained, *infra*, the gun supplied the probable cause needed to arrest the men and continue the search of the vehicle.

In a recent case, this Court affirmed a trial court's finding that the record contained evidence of reasonable suspicion where the officer testified to a defendant's extreme nervousness after he stopped the defendant in a routine traffic stop. *State v. Provet*, 405 S.C. 101, 105–06, 747 S.E.2d 453, 455 (2013). After the defendant produced his driver's license and vehicle registration, the officer noticed his hands shaking excessively and his breathing accelerated. *Id.* After the officer made several observations, such as the vehicle's registra-

therefore find this to be an objectively reasonable, articulable suspicion. Under the United States Supreme Court's definition of reasonable suspicion, the facts and inferences relied on by the officer must be articul*able*, not necessarily articulat*ed. See, e.g., Terry*, 392 U.S. at 21, 88 S.Ct. 1868. It is certainly preferable for the State to more clearly inquire of the officer as to whether he made the logical leap connecting the BOLO to the car's occupants. However, the failure to do so does not alone prevent the stop from being supported by objective, specific, articulable facts and the officer's rational inferences.

tion to a third party and numerous air fresheners in the vehicle, the officer requested to search the car, to which the defendant consented. *Id.* at 106, 111–12, 747 S.E.2d at 456, 459. *Despite the fact that the Court agreed with the defendant that the existence of several factors were indicative of innocent travel,* the Court noted, "we must affirm when *any evidence* in the record supports" the trial court's finding. *Id.* at 112, 747 S.E.2d at 459 (emphasis added).

Similarly, here, we find there is evidence in the record that supports the trial court's finding that the police officers had a reasonable, articulable suspicion to detain Petitioner and his co-defendants.

## II. Exceptions to the Warrant Requirement

Generally, the Fourth Amendment requires the police to have a warrant in order to conduct a search. *State v. Weaver,* 374 S.C. 313, 319, 649 S.E.2d 479, 482 (2007). Evidence seized in violation of the warrant requirement must be excluded from trial. *Id.* However, a warrantless search may nonetheless be proper under the Fourth Amendment if it falls within one of the well-established exceptions to the warrant requirement. *State v. Moore,* 377 S.C. 299, 308–09, 659 S.E.2d 256, 261 (Ct.App.2008). "These exceptions include ...: (1) search incident to a lawful arrest; (2) hot pursuit; (3) stop and frisk; (4) automobile exception; (5) the plain view doctrine; (6) consent; and (7) abandonment." *State v. Brown,* 401 S.C. 82, 89, 736 S.E.2d 263, 266 (2012). Furthermore, if police officers are following their standard procedures, they may inventory impounded property without obtaining a warrant. *See Colorado v. Bertine,* 479 U.S. 367, 372–73, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

The trial court found that, because the police officers had reasonable suspicion of criminal activity afoot, the officers properly seized the gun with the serial numbers removed under the plain view exception. Additionally, the trial court found that the police officers did not need a warrant to search the rest of the vehicle after discovering the initial gun because: (1) under the search-incident-to-an-arrest exception, the officers had a reasonable belief that the vehicle contained evidence of the offense for which the co-defendants were

arrested; (2) under the automobile exception, the officers had probable cause to believe the vehicle contained contraband; and (3) under the inventory exception, the officers would have inevitably discovered the evidence during an inventory check. We agree.

### A. Plain View Exception

"Under the 'plain view' exception to the warrant requirement, objects falling within the plain view of a law enforcement officer who is rightfully in a position to view the objects are subject to seizure and may be introduced as evidence." *State v. Wright*, 391 S.C. 436, 443, 706 S.E.2d 324, 327 (2011). Therefore, for evidence to be lawfully seized under the plain view exception, the State must show: (1) the initial intrusion which afforded the police officers the plain view of the evidence was lawful; and (2) the incriminating nature of the evidence was immediately apparent to the seizing authorities. *Id.*

We find the initial intrusion that afforded the officers the plain view of the gun with the serial number removed was lawful because the officers had reasonable suspicion to initiate the stop. *See supra.* Further, the incriminating nature of the gun was immediately apparent upon the gun coming into view because the officers each immediately noticed that the serial number had been removed. *See* S.C.Code Ann. § 16–23–30(C) (criminalizing possession of a handgun with its serial number removed or obliterated). In conjunction with the officers questioning the vehicle's occupants regarding their potential involvement in the armed robbery at Benders, we find the trial court properly admitted the gun into evidence.

### B. Search Incident to a Lawful Arrest Exception

Petitioner contends that the evidence found in the trunk should have been excluded because the trunk search exceeded the scope of the search-incident-to-arrest exception. Specifically, Petitioner points out that he and his co-defendants were handcuffed and standing outside of the vehicle before the police officers searched the car after finding the gun with the serial number removed. Because we find the officers had a reasonable belief that the vehicle contained evidence of the

criminal offense for which the co-defendants were arrested, we disagree.

The permissible scope of searches incident to lawful arrests changed between the time the officers searched the vehicle Petitioner was driving and the time Petitioner's trial occurred. It is therefore helpful to examine the recent evolution of the law.

In *Chimel v. California,* the United States Supreme Court initially held that, in the cases of a lawful custodial arrest, the police may conduct a contemporaneous, warrantless search of the person arrested and the immediate surrounding area. 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Supreme Court justified these warrantless searches because they (1) ensured officer safety by "remov[ing] any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape" and (2) "prevent[ed the] concealment or destruction" of evidence. *Id.*

*Chimel's* rule "proved difficult to apply, particularly in cases that involved searches inside of automobiles after the arrestees were no longer in them." *Davis v. United States,* —— U.S. ——, ——, 131 S.Ct. 2419, 2424, 180 L.Ed.2d 285 (2011) (quoting *New York v. Belton,* 453 U.S. 454, 458–59, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)) (internal marks omitted). The Supreme Court therefore clarified the *Chimel* rule in *Belton* by outlining a bright-line rule concerning arrests of automobile occupants. Specifically, the Supreme Court held that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 S.Ct. 2860. The Supreme Court justified the search on the grounds that the "articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact *generally, even if not inevitably,* within the area into which an arrestee might reach in order to grab a weapon or evidentiary item." *Id.* (emphasis added) (quoting *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034) (internal marks omitted). The Supreme Court held that, while searching the passenger compartment, the officers could also examine the contents of any containers found within the passenger compartment as well because "if the passenger

compartment is within the reach of the arrestee, so also will containers be within his reach." *Id.*

The *Belton* court specifically excluded the trunk from the permissible scope of a search incident to an arrest. *Id.* at 460 n. 4, 101 S.Ct. 2860. In a separate Fourth Amendment case decided the same day as *Belton,* Justice Powell explained in his concurring opinion that *Belton* prohibited trunk searches because the trunk "is not within the control of the passengers either immediately before or during the process of arrest." *Robbins v. California,* 453 U.S. 420, 431–32, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (Powell, J., concurring in the judgment), *overruled on other grounds by United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

However, subsequent courts found that, in certain situations, the " 'trunk' (in the traditional sense) [ ] constitut[ed] part of the passenger compartment for purposes of search incident to arrest." *United States v. Olguin–Rivera,* 168 F.3d 1203, 1205–06 (10th Cir.1999). In general, courts would find the trunk part of the passenger compartment—and thus subject to a warrantless search incident to a lawful arrest—when the trunk was "reachable *without exiting the vehicle,* without regard to the likelihood in the particular case that such a reaching was possible." *United States v. Doward,* 41 F.3d 789, 794 (1st Cir.1994) (quoting 3 Wayne R. Lafave, *Search and Seizure: A Treatise on the Fourth Amendment* § 7.1(c), at 16–17 (2d ed.1987)); *see also Olguin–Rivera,* 168 F.3d at 1206 n. 1 (collecting cases); *United States v. Pino,* 855 F.2d 357, 364 (6th Cir.1988) (holding that this rule "satisfies the twin objectives of *Belton* in preventing a suspect's access to weapons and easily-destroyed evidence within his vehicle and creating a standardized rule of criminal procedure which the police can follow routinely").

Courts faithfully applied the *Belton* rule for the next twenty-eight years and allowed the police to search the passenger compartment of a vehicle incident to the arrest of a recent occupant of the vehicle, even if the arrestee had been handcuffed and secured in the back of the officer's patrol car prior to the search. *See Davis,* —— U.S. ——, ——, 131 S.Ct. at 2424, 2424 n. 3 (collecting cases). However, in *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009), the

Supreme Court limited *Belton*'s bright-line rule. There, the Supreme Court found that, if the arrestee was already secured and outside of reaching distance from the passenger compartment of the vehicle at the time of the search, a search could not be justified under the traditional rationale—protecting officer safety and preventing the destruction of evidence. *Id.* at 343, 129 S.Ct. 1710. Therefore, the Supreme Court set forth the new rule: police may search the passenger compartment of a vehicle incident to a recent occupant's arrest only if (1) the arrestee is "unsecured and within reaching distance of the passenger compartment at the time of the search," or (2) it is reasonable to believe the vehicle contains evidence of the crime of arrest. *Id.* (citing *Thornton v. United States*, 541 U.S. 615, 632, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia, J., concurring in the judgment)).[10] Absent either of those two instances, "a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." *Brown*, 401 S.C. at 91, 736 S.E.2d 263.

We note initially that the search of the vehicle here occurred while *Belton* was in effect. However, because this is Petitioner's belated direct appeal, we nonetheless must apply the law as it currently stands and therefore look to the *Gant* rule for direction on whether the search of the trunk was permissible. *Narciso v. State*, 397 S.C. 24, 31, 723 S.E.2d 369, 372 (2012) ("Newly announced rules of constitutional criminal procedure must apply retroactively to all cases, pending on direct review or not yet final, with no exception for cases in which a new rule constitutes a clear break with the past.") (quoting *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)) (internal quotation marks omitted); *see also Davis*, —— U.S. ——, ——, 131 S.Ct. at 2426 (applying *Gant* on direct appeal when the search occurred while *Belton* was the prevailing law); *Brown*, 401 S.C. at 94–95, 736 S.E.2d at 269 (same).

We find that the first justification under the *Gant* rule (arrestee unsecured and within reach of area to be

---

10. We find no indication in any subsequent case law that the new *Gant* rule in any way changed the scope of the permissible search area when searching incident to an arrest, *i.e.,* the passenger compartment only.

searched) does not apply here. Several officers had hand-cuffed Petitioner and his co-defendants at the back of the vehicle and were closely supervising them while other officers searched the car. The likelihood of the supervised, hand-cuffed men reaching the passenger compartment to either obtain a weapon or destroy evidence was therefore highly unlikely.

However, we find that the second justification under *Gant* (reasonable to believe vehicle contains evidence of a crime) does apply in this instance. The officers arrested the suspects for the unlawful possession of a handgun with its serial number removed. Finding this gun, in conjunction with their knowledge of the BOLO and their suspicion that Petitioner and his co-defendants were in fact the four men involved in the armed robbery at Benders, provided the officers probable cause to likewise arrest them for armed robbery.[11] Because there were four men involved in the armed robbery, and only one gun had thus far been recovered, it was reasonable to believe the vehicle contained further evidence of the armed robbery.

Furthermore, although *Belton*—and thus presumably *Gant*—excluded the trunk from the permissible scope of a search incident to a lawful arrest, we have not previously had the opportunity to address the issue of whether the trunk may, at times, be part of the passenger compartment, as many other courts have likewise found. We hereby adopt the view that the trunk may be considered part of the passenger

---

11. Probable cause is defined as "a fair probability that contraband or evidence of a crime will be found." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Probable cause to arrest depends upon whether, at the moment the arrest was made ... the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information was sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964)) (internal marks omitted). The record is not clear whether the police arrested Petitioner solely for unlawful possession of a handgun with its serial number removed or for armed robbery as well. However, Petitioner has never raised this issue, and we find there was probable cause to arrest him for armed robbery after the officers saw the gun on the floorboards.

compartment and may therefore be searched pursuant to a lawful arrest when the trunk is reachable without exiting the vehicle, as it was in this case. *See Olguin–Rivera,* 168 F.3d at 1205–06, 1206 n. 1; *Doward,* 41 F.3d at 794; *Pino,* 855 F.2d at 364.

Here, the other three guns were found in the trunk and would normally be excluded from the permissible scope of the search; however, because the passenger compartment contained a gap into the trunk that made the guns visible and freely accessible from the backseat, we believe the guns and the trunk area were "within the control of the passengers either immediately before or during the arrest." *Robbins,* 453 U.S. at 431–32, 101 S.Ct. 2841 (Powell, J., concurring in the judgment). We therefore find that the trial court properly admitted the evidence in the trunk as part of the search of the passenger compartment.[12]

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., concurring in a separate opinion in which BEATTY, J., concurs.

Justice PLEICONES.

I concur but write separately as I view the dispositive issues somewhat differently. I begin by noting there are only three issues raised by petitioner in his belated appeal. First, he contends that he was unlawfully detained when the officer pulled into the parking lot and blocked the parked car. Next, he argues he was unlawfully detained after the check of the car's license tag and his driver's license came back "clean." Finally, he contends that the search of trunk exceeded the

---

12. The State argues in the alternative that the search of the trunk was justified by the automobile exception and the inventory search exception to the warrant requirement. However, because the other issues are dispositive, we need not reach these issues. *Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.,* 382 S.C. 295, 307, 676 S.E.2d 700, 706 (2009) (finding that an appellate court need not discuss remaining issues when determination of prior issue is dispositive).

permissible scope of a search under *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). As explained below, I find no unlawful detentions, and while I agree the search here violated *Gant,* the trial judge also upheld the search as permissible under the automobile exception to the Fourth Amendment warrant requirement. *See United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). This unchallenged ruling, whether correct or not, is the law of the case. *E.g., State v. Black,* 400 S.C. 10, 732 S.E.2d 880 (2012).

The record shows that the officer noticed the parked car at 10:06 p.m. He entered the lot and pulled in behind the vehicle, at which point he saw four individuals seated in the car. The officer ran the license plate and then approached the car to ask petitioner, seated in the driver's seat, for his driver's license. When he returned to his cruiser with the license, the officer called for back-up. Two additional officers arrived within one to two minutes of this call, driving into the parking lot while the first officer was speaking to the driver and returning the license.

To the extent petitioner contests the patrol officer's right to conduct an investigatory check of the parked car, I would find no Fourth Amendment violation. In my opinion, the patrol officer did not violate the Constitution when he conducted a welfare check on a car, parked in the dark area of a closed church parking lot, after 10 p.m. on a Tuesday evening. *See Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

Petitioner next contends that the detention here was unreasonable. The four occupants matched the general description of four armed suspects who had robbed a bar and its patrons at about 9:50 p.m. The bar was located about 3–4 miles away from the lot and there was evidence it took less than ten minutes to drive from the bar to the church parking lot. The general description had been given in a BOLO sent at approximately 9:53 p.m. As the two back-up officers approached the parked car less than five minutes had elapsed since the first officer observed it at 10:06 p.m. When the back-up officers approached the car, the men became silent, looked straight ahead, and acted nervous. Taken together, I find these facts

created objective [13] reasonable suspicion permitting the continued detention of petitioner. *State v. Provet*, 405 S.C. 101, 747 S.E.2d 453 (2013). The trial judge correctly held this detention did not violate petitioner's Fourth Amendment rights.

Petitioner does not challenge the subsequent request that he and the passengers exit the vehicle, the seizure of the gun that was observed after the rear passengers vacated, or the subsequent arrests. Instead, petitioner argues only that the search of the trunk exceeded that permitted by *Gant*. Although this issue should be decided under the law of the case doctrine, *State v. Black, supra*, since I disagree with the majority's application of *Gant*, I will address the merits briefly.

Under *Gant*, officers may search a vehicle incident to the occupant's arrest only if (1) the arrestee is within reaching distance of the passenger compartment when the search is conducted or (2) "it is reasonable to believe the vehicle contains evidence of the arrest." *Gant*, 556 U.S. at 343, 129 S.Ct. 1710. As the parties acknowledge, the search here could only be upheld under the second *Gant* scenario.[14] However, a *Gant* search is limited to the passenger compartment itself and the containers located therein, and the trunk is not within the permissible scope of an "evidence of the arrest" search. *Gant*, 556 U.S. at 344, 129 S.Ct. 1710.[15] If this search is to be sustained, then it must be pursuant to a different exception to the Fourth Amendment's warrant requirement.

*Gant* recognizes the continued validity of the automobile exception, citing *United States v. Ross*, 456 U.S. 798, 102 S.Ct.

---

13. The majority opinion may be read to suggest that reasonable suspicion is a subjective rather than objective judgment. *See* fn. 9, *supra*.

14. The majority purports to apply this second *Gant* exception but apparently recognizes the weakness of upholding a vehicle search for evidence of a no-serial-number handgun which has already been seized. It thus transmogrifies the arrest for the weapon into one for the armed robbery, despite the arresting officer's testimony that "After we found the [altered] .22 they were all placed under arrest for that weapon."

15. The majority creates a hybrid third exception to *Gant*, holding that if the trunk would have been accessible to an occupant (which derives from the first *Gant* scenario), then even though the individual has been removed from the vehicle the trunk is part of the passenger compartment for purposes of the second permissible *Gant* search.

2157, 72 L.Ed.2d 572 (1982). *Gant,* 556 U.S. at 347, 129 S.Ct. 1710. Here, the trial judge held the officers had probable cause to search the vehicle for evidence of the bar robbery under Ross's automobile exception. This unchallenged ruling, whether correct or not, is the law of the case. *State v. Black,* *supra.*

I concur in the majority's decision to affirm petitioner's belated appeal.

BEATTY, J., concurs.