## THE STATE OF SOUTH CAROLINA
### In The Supreme Court

The State, Respondent,

v.

Michael N. Frasier, Jr., Petitioner.

Appellate Case No. 2020-001405

_____

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

_____

Appeal from Charleston County
Deadra L. Jefferson, Circuit Court Judge

_____

Opinion No. 28117
Heard March 15, 2022 – Filed September 28, 2022

_____

### REVERSED

_____

Appellate Defender Kathrine Hudgins, of Columbia, for
Petitioner.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia, and Solicitor Scarlett Anne Wilson, of
Charleston, all for Respondent.

_____

**JUSTICE HEARN:** Petitioner Michael Frasier was convicted of trafficking cocaine
in excess of 100 grams after police discovered cocaine during a traffic stop for an
inoperable brake light. The questions before the Court concern whether police had

reasonable suspicion to prolong the traffic encounter and whether Frasier consented to the search. The trial court concluded the officer had reasonable suspicion and Frasier consented, and the court of appeals affirmed. In deciding these two issues, we clarify the scope of this Court's standard of review in the Fourth Amendment context. Ultimately, we reverse the court of appeals because law enforcement lacked reasonable suspicion to prolong the traffic stop and Frasier did not consent to the search.

## FACTS/PROCEDURAL HISTORY

During the morning of August 14, 2013, two plainclothes officers with the North Charleston Police Department sat in an unmarked car outside a bus station conducting a routine drug interdiction as part of the department's narcotics division. On this particular morning, Frasier had traveled from New York to North Charleston on a commercial bus. The two officers were approximately 75 to 100 yards away from the bus station's exit when they observed Frasier leave the station. According to the officers, Frasier immediately stopped after exiting the station and looked left and right before walking about ten yards to a vehicle driven by Cheryl Jones. Frasier entered the vehicle, and the two left the station. Officers characterized Frasier's conduct as clearing the area for threats, including law enforcement, which they deemed suspicious. As the vehicle left the station, the officers discovered that it had an inoperable third brake light. Accordingly, one of the officers called Steven Hall, a patrol officer who previously had worked in the narcotics department, to perform a traffic stop. Although the legal basis for the traffic stop stemmed from the broken brake light, the officers informed Hall that Frasier seemed suspicious. However, the officers never informed Hall of the specific conduct that raised their suspicion, such as Frasier's scanning the parking lot.

Hall subsequently caught up to the vehicle on the North Bridge over the Ashley River after reaching a speed of 87 miles per hour. Jones used her turn signal to get into the left lane and out of the officer's way. Apparently upon realizing that she was being pulled over, she then turned on her flashers and moved into the right lane before pulling off the road. Hall testified that Jones took longer than usual to pull over although the dashcam video indicated it took less than a minute. Hall exited his patrol car and approached Jones's vehicle. He informed Jones that her brake light was out, and while talking with her, Hall noticed the zipper was down on her pants. He testified that, from his experience, this suggested she was potentially hiding contraband in her pants. Hall testified that Frasier "just appeared to be nervous. He was sweating profusely. Did not want to really interact with me a whole lot as far as eye contact, something like that." Hall asked them where they were traveling from, and after repeating the question several times, Jones answered that she picked up

Frasier from the bus stop. Hall requested Jones's driver's license, but she did not have it on her; instead, she gave him her personal information, and dispatch indicated that she did not have any outstanding warrants. Hall can be heard on the dashcam video telling dispatch that he is going to issue a warning ticket and try to obtain consent to search the car. Hall subsequently exited his patrol car, walked over to Jones and asked her to step out of her vehicle. Jones complied and consented for Hall to search the vehicle. Another patrol officer arrived on scene during the traffic stop, and both officers walked over to the passenger side door and asked Frasier to step out of the vehicle. Frasier complied, and placed his hands in his pockets. Hall immediately told Frasier to remove his hands from his pockets and asked Frasier if he would mind if he searched him. Frasier raised his hands in the air and said, "I do, but . . . ." Frasier subsequently placed his hands on the hood of the car at the direction of Hall. Ultimately, Hall found a white powdery substance later identified as cocaine on Frasier and a larger quantity in Frasier's jacket in the back seat of the vehicle. Frasier was arrested and charged with trafficking in cocaine in excess of 100 grams.

Thereafter, Frasier filed two motions to suppress, one contending Hall lacked reasonable suspicion to prolong the traffic stop and the second asserting he never consented to the search. Following the testimony of the officers, which was consistent with the account relayed above, Frasier argued all the drugs should be suppressed. The solicitor contended the following established reasonable suspicion to prolong the traffic stop in order to obtain consent: 1) Frasier's behavior at the bus stop, specifically traveling on a commercial bus which law enforcement knew was frequented by drug traffickers and his "scanning" the parking lot upon exiting the bus station; 2) Jones's purportedly "evasive driving" and the delay in pulling over; 3) the zipper down on her pants; 4) "evasively not answering very simple direct questions" such as where they were coming from; 5) the sense of nervousness Frasier displayed; and 6) "his sweating profusely."

Frasier contended once Hall wrote the warning ticket, the legal justification for the stop ended, and nothing the officer relied on established reasonable suspicion to prolong the encounter. The trial court stated that this issue "is at best a 50/50 call." Ultimately, the court denied Frasier's motion to suppress, concluding the facts above supported a finding of reasonable suspicion, with the exception of Jones's alleged "evasive driving" and taking too long to pull over. The court found Jones's driving reasonable, and thus, it did not take that fact into consideration.

As to Frasier's second argument—that he did not give Hall consent to search him—defense counsel noted that Frasier responded, "I do, but . . ." in response to Hall asking whether he minded being searched. The solicitor contended that, "it was the officer's belief, as he testified earlier, that his words and actions together was

[sic] consent." The trial court concluded the dashcam video unambiguously showed that Frasier consented to the search by virtue of his words and conduct, and it denied the second motion to suppress as well.

Ultimately, the jury found Frasier guilty, and the trial court sentenced him to the mandatory minimum sentence of twenty-five years imprisonment. Frasier appealed to the court of appeals which affirmed, citing our deferential standard of review and concluding evidence supported the trial court's decision. Frasier subsequently filed a petition for a writ of certiorari, which the Court granted in part.[1]

## ISSUES

I.  Did the court of appeals err in affirming the trial court's decision that Officer Hall had reasonable suspicion to prolong the traffic stop in order to subsequently ask for consent to search?

II.  Did the court of appeals err in affirming the trial court's determination that Frasier gave Officer Hall consent to search him?

## STANDARD OF REVIEW

Before reaching the merits, we take this opportunity to clarify our standard of review when reviewing an appeal from a motion to suppress based on Fourth Amendment grounds. Historically, we have repeatedly noted that appellate courts review an appeal from a motion to suppress based on a violation of the Fourth Amendment under the deferential "any evidence" standard. *See, e.g.*, *State v. Morris*, 411 S.C. 571, 578, 769 S.E.2d 854, 858 (2015). Pursuant to this standard, our appellate courts "will not reverse a trial court's finding of fact simply because it would have decided the case differently." *State v. Spears*, 429 S.C. 422, 433, 839 S.E.2d 450, 455 (2020) (quoting *State v. Pichardo*, 367 S.C. 84, 96, 623 S.E.2d 840, 846 (Ct. App. 2005)).

In *State v. Brockman*, 339 S.C. 57, 528 S.E.2d 661 (2000), this Court declined to follow the United States Supreme Court's decision in *Ornelas v. United States*, 517 U.S. 690 (1996) requiring federal courts to employ a more rigorous two-part analysis where courts defer to the trial court's factual findings but review the ultimate legal conclusion de novo. *Brockman* concluded that *Ornelas* was an advisory

---

[1] This Court denied Frasier's argument concerning the admission of statements Frasier made following a *Miranda* warning when officers had asked similar questions before *Miranda* was given.

opinion, and thus, the Court declined to implement de novo review. *Id.* at 64-65, 528 S.E.2d at 664-65. At the time this Court issued *Brockman*, appellate courts routinely reviewed cold records and depended on trial courts to review credibility and weigh conflicting evidence in reaching its decision. However, with the dawn of the technological age, appellate courts are no longer dependent on the trial court in our review of evidence. The most obvious example is the advent of body and dashcam footage, whereby this Court reviews the same video as the trial court. Accordingly, while the need for deference remains, particularly in determining issues of credibility, it is no longer necessary for us to defer to the trial court's overall ruling in every case. Instead, we take this opportunity to refine our standard of review to better align with the federal standard, which has been adopted in nearly every state.[2]

---

[2] *See James v. State*, 197 So.3d 532, 535 (Ala. Crim. App. 2015); *State v. Miller*, 207 P.3d 541, 543 (Alaska 2009); *State v. Fornof*, 179 P.3d 954, 956 (Ariz. Ct. App. 2008); *MacKintrush v. State*, 479 S.W.3d 14, 17 (Ark. 2016); *People v. Letner and Tobin*, 235 P.3d 62, 99-100 (Cal. 2010); *People v. McKnight*, 446 P.3d 397, 402 (Colo. 2019); *State v. Lewis*, 217 A.3d 576, 586-87 (Conn. 2019); *Lopez-Vasquez v. State*, 956 A.2d 1280, 1284-85 (Del. 2008); *Huffman v. State*, 937 So.2d 202, 205-06 (Fla. Dist. Ct. App. 2006); *State v. Cartee*, 844 S.E.2d 202, 203 (Ga. Ct. App. 2020); *State v. Spillner*, 173 P.3d 498, 504 (Haw. 2007) (reviewing a trial court's ruling on a motion to suppress evidence de novo); *State v. Perez*, 434 P.3d 801, 803 (Idaho 2018); *People v. Timmsen*, 50 N.E.3d 1092, 1097 (Ill. 2016); *Marshall v. State*, 117 N.E.3d 1254, 1258 (Ind. 2019); *State v. Brown*, 930 N.W.2d 840, 844 (Iowa 2019); *State v. Hanke*, 415 P.3d 966, 969 (Kan. 2018); *Commonwealth v. Conner*, 636 S.W.3d 464, 471 (Ky. 2021); *State v. Boeh*, 324 So.3d 653, 659-60 (La. Ct. App. 2021); *State v. Sasso*, 143 A.3d 124, 129 (Me. 2016); *State v. Holt*, 51 A.3d 1, 7 (Md. Ct. Spec. App. 2012); *Commonwealth v. Henley*, 171 N.E.3d 1085, 1097 (Mass. 2021); *People v. Pagano*, 967 N.W.2d 590, 592 (Mich. 2021); *State v. Bergerson*, 671 N.W.2d 197, 201 (Minn. Ct. App. 2003); *Eaddy v. State*, 63 So.3d 1209, 1212 (Miss. 2011); *State v. Peery*, 303 S.W.3d 150, 153 (Mo. Ct. App. 2010); *State v. Neiss*, 443 P.3d 435, 443 (Mont. 2019); *State v. Shiffermiller*, 922 N.W.2d 763, 772 (Neb. 2019); *State v. Beckman*, 305 P.3d 912, 916 (Nev. 2013); *State v. Francisco Perez*, 239 A.3d 975, 981 (N.H. 2020); *State v. Nyema*, 267 A.3d. 449, 459 (N.J. 2022); *State v. Ochoa*, 206 P.3d 143, 147 (N.M. Ct. App. 2008) ("The constitutionality of a search or seizure is a mixed question of law and fact and demands de novo review."); *People v. Blandford*, 176 N.E.3d 1043, 1044 (N.Y. 2021); *State v. Watson*, 792 S.E.2d 873, 874 (N.C. Ct. App. 2016); *State v. Marsolek*, 964 N.W.2d 730, 735 (N.D. 2021); *State v. Hawkins*, 140 N.E.3d 577, 580-81 (Ohio 2019); *Fuentes v. State*, __ P.3d __, __ 2021 WL 3027309 (Okla. Crim. App. 2021); *State v. Maciel-Figueroa*, 389 P.3d 1121, 1123 (Or. 2017); *Commonwealth v. Smith*,

Accordingly, appellate review of a motion to suppress based on the Fourth Amendment involves a two-step analysis. This dual inquiry means we review the trial court's factual findings for any evidentiary support, but the ultimate legal conclusion—in this case whether reasonable suspicion exists—is a question of law subject to de novo review.

## DISCUSSION

I.     *Reasonable Suspicion to Prolong the Traffic Stop*

Frasier contends Hall did not have reasonable suspicion to prolong the traffic stop beyond the purpose of issuing the warning for an inoperable third brake light. He asserts law enforcement had, at best, an "unparticularized suspicion or hunch, not reasonable suspicion to justify the prolonged detention." Conversely, the State argues evidence supports the trial court's determination that Hall had reasonable suspicion of potential criminal activity, and therefore, the extension of the initial traffic stop was constitutionally permissible. Applying the facts as found by the trial court, we disagree these findings rise to the level of reasonable suspicion.

"A person has been seized within the meaning of the Fourth Amendment at the point in time when, in light of all the circumstances surrounding an incident, a reasonable person would have believed that he was not free to leave." *Robinson v. State*, 407 S.C. 169, 181, 754 S.E.2d 862, 868 (2014). Once police pull over a motor vehicle for a traffic violation, "the police may order the driver to exit the vehicle without violating Fourth Amendment proscriptions on unreasonable searches and seizures." *State v. Pichardo*, 367 S.C. 84, 98, 623 S.E.2d 840, 847 (Ct. App. 2005) (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977)). "In carrying out the stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Id.* (citing *United States v. Sullivan,* 138 F.3d 126 (4th Cir. 1998)).

---

164 A.3d 1255, 1257 (Pa. Super. Ct. 2017); *State v. Taveras*, 39 A.3d 638, 645-46 (R.I. 2012); *State v. Moore*, 415 S.C. 245, 251 781 S.E.2d 897, 900 (2016); *State v. Aaberg*, 718 N.W.2d 598, 600 (S.D. 2006); *State v. Smith*, 484 S.W.3d 393, 399 (Tenn. 2016); *Herrera v. State*, 546 S.W.3d 922, 926 (Tex. App. 2018); *Salt Lake City v. Street*, 251 P.3d 862, 865 (Utah Ct. App. 2011); *State v. Rutter*, 15 A.3d 132, 135 (Vt. 2011); *McArthur v. Commonwealth*, 845 S.E.2d 249, 252 (Va. Ct. App. 2020); *State v. Gatewood*, 182 P.3d 426, 427-28 (Wash. 2008); *State v. Bookheimer*, 656 S.E.2d 471, 476 (W.Va. 2007); *State v. Reed*, 920 N.W.2d 56, 65-66 (Wis. 2018); *Jennings v. State*, 375 P.3d 788, 790 (Wyo. 2016).

In order to prolong or exceed the scope of a stop beyond the initial traffic violation, law enforcement must have reasonable suspicion that criminal activity may be afoot. *Robinson*, 407 S.C. at 182, 754 S.E.2d at 868-69 ("If, during the stop of the vehicle, the officer's suspicions are confirmed or further aroused—even if for a different reason than he initiated the stop—the stop may be prolonged, and the scope of the detention enlarged as circumstances require."). Although reasonable suspicion is not susceptible to a rigid, formulaic approach, it requires more than a mere hunch or unparticularized suspicion. *Id.* at 182, 754 S.E.2d at 868. In other words, for an officer to have reasonable suspicion, "there [must] be an objective, specific basis for suspecting the person stopped of criminal activity." *Id.* While reasonable suspicion is not a high bar and "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). This inquiry involves the totality of the circumstances, and "[c]ourts must give due weight to common sense judgments reached by officers in light of their experience and training." *State v. Moore*, 415 S.C. 245, 252-53, 781 S.E.2d 897, 901 (2016).

In *Moore*, a police officer pulled over a vehicle on I-85 for speeding. *Id.* at 248, 781 S.E.2d at 899.[3] The officer testified he smelled alcohol, and the occupant admitted to having a couple drinks. During the stop, Moore passed two of three field sobriety tests. The vehicle was registered out of state to a third party, and the officer found $600 on Moore during a consensual pat down. *Id.* at 249, 781 S.E.2d at 899. The officer subsequently asked Moore if he could search the vehicle, but Moore declined. *Id.* The officer decided not to charge Moore with driving while impaired, but he did request a canine unit, which subsequently alerted to the presence of drugs. The State relied on the following facts to support the presence of reasonable suspicion:

---

[3] The officer in *Moore* testified the driver took longer than usual to pull over and was evasive because he initially used his left turn signal before finally pulling onto the right shoulder. *Id.* at 250, 781 S.E.2d at 899. Officer Hall testified Jones was evasive as she took longer than usual to pull off the side of the road and initially switched to the left lane before exiting the highway on the right shoulder. However, the trial court expressly rejected this factor in its totality of the circumstances approach. Nevertheless, the State continues to argue that this fact is relevant. We disagree, as the video in question clearly shows Jones did not attempt to evade police.

(1) Moore initially turned on his left turn signal but then pulled his vehicle over to the right; (2) the time Moore took to pull over was longer than average, indicating the possibility of flight; (3) Deputy Owens noticed an odor of alcohol emanating from the vehicle, which led him to believe that Moore had been drinking in order to calm his nerves; (4) Moore smoked several cigarettes, which was also an indicator that he might be trying to calm his nerves; (5) Moore continued to talk on the phone during the traffic stop, which was an indicator of criminal activity as phones provide a means of communication between drug traffickers; (6) Moore's hands were shaking when he handed Deputy Owens his driver's license and rental agreement; (7) Moore's pulse appeared to be rapid; (8) Moore's breathing was heavy; (9) Moore tried to pick up his cell phone when he was asked to exit his vehicle, also indicating the possibility of flight; (10) Moore was carrying a large sum of money in his pocket despite being unemployed; (11) Moore was driving a rental car, which was rented by a third party; and (12) Moore was leaving a suburb of Atlanta, which is a known drug trafficking hub.

*Id.* at 249-50, 781 S.E.2d at 899-900. Notably, while the Court determined at least some evidence supported the trial court's decision to deny the motion to suppress, it acknowledged that nervousness is typically present in any encounter with police. The Court cautioned law enforcement that although "nervous behavior is a pertinent factor in determining reasonable suspicion, we, like many appellate courts, have become weary with the many creative ways law enforcement attempts to parlay the single element of nervousness into a myriad of factors supporting reasonable suspicion." *Id.* at 254-55, 781 S.E.2d at 902.

Here, even after accepting the trial court's factual findings as we must do since they are supported by some evidence, we conclude that Hall lacked reasonable suspicion as a matter of law pursuant to de novo review.[4] The two plainclothes officers relayed to Hall that Frasier seemed suspicious, but that was only based on a subjective hunch. While "scanning the parking lot" is a relevant factor, it is far from establishing reasonable suspicion. Accordingly, in order for Hall to prolong the traffic encounter, there had to be more indications of criminal activity once Hall initiated the traffic stop. Although the State contends the following additional facts

---

[4] We note the trial court believed the issue was at best 50/50 but ruled in favor of the State. When a case boils down to a flip of the coin, the Fourth Amendment requires that we find in favor of the defendant since the State has the burden to demonstrate reasonable suspicion.

establish reasonable suspicion—repeating questions, noticing Jones's unzipped zipper, sweating, and being nervous—we disagree.[5] Hall did not see any items that would demonstrate potential criminal activity—such as cash on hand, hollowed out blunt cigars, or the smell of marijuana—before deciding to extend the stop. *See Moore*, 415 S.C. at 249, 781 S.E.2d at 899 (officers found a "wad" of $600 in cash); *Morris*, 411 S.C. at 581, 769 S.E.2d at 859 (police saw hollowed out cigars and smelled marijuana). It is equally apparent that this was a drug stop masquerading as a traffic encounter. Indeed, the goal of the stop was to "try to obtain consent," as Hall can be heard telling dispatch on the dashcam video. While we do not suggest that pretexual stops are illegal, in order to prolong the stop, there must be an *objective* basis for concluding that criminal activity may be afoot. Simply put, "[i]n law, the ends do not justify the means." *State v. Adams*, 409 S.C. 641, 654, 763 S.E.2d 341, 348 (2014). Because the State failed to meet its burden of demonstrating reasonable suspicion, we reverse.

---

[5] Jones told Hall during the traffic stop that her zipper was undone because she had just taken a shower before meeting Frasier at the bus station. Concerning the fact that Frasier sweated, we agree with the trial court's statement that "[e]verybody sweats profusely in August in Charleston. I sweat profusely in Charleston in August. It's hot at 6 in the morning. As soon as you walk out the door, it's 90 to 100 percent humidity." The solicitor responded that he had the almanac showing the temperature and humidity for the day in question and "would be happy to give it to you." The court answered, "No. I live in Charleston. I've lived in Charleston my whole life . . . ." Further, although Hall testified that the driver door opening during the stop was unusual, he never articulated a reason as to how that fact was potentially indicative of illegal behavior.

## II. Frasier's Consent

Frasier contends the court of appeals erred in affirming the trial court's conclusion that he gave Hall consent to search him. The State asserts there is evidence in the record to support the trial court's decision. We agree with Frasier.

Warrantless searches are generally considered per se unreasonable unless they fall within a recognized exception under the Fourth Amendment. Police may search an individual if that person consents, but the burden is on the State to demonstrate consent. *State v. Harris*, 277 S.C. 274, 276, 286 S.E.2d 137, 138 (1982) ("However, the State bears the burden of proving the voluntariness of a consent to search from the totality of the surrounding circumstances."). Law enforcement must obtain consent voluntarily, which is a fact-intensive inquiry viewed under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). Police do not need to tell an individual that he can refuse to consent, but it is a factor in the overall analysis. *Id.*; *State v. Forrester*, 343 S.C. 637, 645, 541 S.E.2d 837, 841 (2001) ("Therefore, like the federal standard, our state standard does not require a law enforcement officer conducting a search to inform the defendant of his right to refuse consent.").

During the pretrial testimony, Hall noted that he asked Frasier "if he minded if I checked him out or searched him, and he said, 'I do, but,' and just kind of put his hands up on top of the car." The State also described the encounter as, "[R]egarding his actions, Frasier shrugged his shoulders, placed his hands on top of Jones's vehicle, positioned himself in a manner such that the officer could search him, and exposed both his body and his pockets to the officer." Because we are able to view the same video as the trial court, we can make an independent finding and are not constrained to defer to the trial court's conclusion that Frasier consented through his words and conduct. The video clearly indicates that Frasier stepped out of the vehicle at the direction of one of the officers, with a second officer standing beside him. Once Frasier began to place his hands in his pockets, Hall understandably told Frasier to remove them. In response, Frasier raised his hands over his head and began to turn. Hall testified it was Frasier's conduct that indicated he consented to a search, but it is clear from the video that Frasier only placed his hands on the vehicle at the direction of the officer. Indeed, after asking whether Frasier had any weapons on him, Hall asked Frasier to "put his hands up on the car for me." Accordingly, because Frasier's conduct was at the direction of the officer, it was not a voluntary decision to allow Hall to search him. Thus, the State failed to prove that Frasier voluntarily consented, and we therefore reverse on this ground as well.

## CONCLUSION

We hold law enforcement lacked reasonable suspicion to prolong the traffic stop, and thus, the discovery of cocaine was the product of an illegal seizure. We also conclude that Frasier did not voluntarily consent. Accordingly, we reverse the court of appeals.

**REVERSED.**

**BEATTY, C.J., KITTREDGE, FEW and JAMES, JJ., concur.**