# IN THE SUPREME COURT
## STATE OF NORTH DAKOTA

## 2021 ND 175

State of North Dakota,                                    Plaintiff and Appellee

  v.

Dylan Marsolek,                                        Defendant and Appellant

## No. 20210041

Appeal from the District Court of Barnes County, Southeast Judicial District, the Honorable Jay A. Schmitz, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice.

Tonya Duffy, State's Attorney, Valley City, N.D., for plaintiff and appellee; submitted on brief.

Mary E. Depuydt, Wishek, N.D., for defendant and appellant.

**Tufte, Justice.**

[¶1] Dylan Marsolek appeals from a criminal judgment entered after he conditionally pled guilty to possession of controlled substances and drug paraphernalia. Marsolek, a passenger in a vehicle involved in a traffic stop, argues he was unlawfully seized because the officers prolonged the traffic stop beyond the time necessary to issue a traffic citation. He argues the evidence resulting from the traffic stop should be excluded because the officer lacked reasonable suspicion to expand the scope of the traffic stop into a drug investigation. We affirm, concluding that the district court did not err in denying Marsolek's motion to suppress evidence because the officer had reasonable suspicion to justify prolonging the traffic stop.

I

[¶2] On April 16, 2020, Barnes County Sheriff's Deputy Nathan Morten initiated a traffic stop after observing a vehicle with an obstructed windshield and an unrestrained back seat passenger. The vehicle did not pull over immediately, but this was later determined to be the result of Deputy Morten's malfunctioning lights. The driver pulled over after hearing the deputy's siren. After the vehicle stopped, Deputy Morten saw the driver reach over to the passenger side like "he was sticking something underneath the passenger seat." Deputy Morten then approached the vehicle and spoke to the driver, Howard Larson. Marsolek was in the front passenger seat, and Esther Cruz was in the backseat. Upon Deputy Morten's request, Larson gave Deputy Morten his driver's license and insurance card. Deputy Morten asked Larson about their travels. Larson stated they were driving back to Jamestown from Fargo. Because they were on County Road 22, well off the interstate highway route typically travelled between the two cities, Deputy Morten asked what they were doing in the area. Larson responded "nothing, just sightseeing." Deputy Morten then requested identification from the passengers. Larson spoke for them, stating they did not have their IDs. They provided their names and dates of birth instead.

1

[¶3] Deputy Morten returned to his vehicle and attempted to run the occupants' names with dispatch. It was then he discovered his radio also was not working. Using his cell phone, he called dispatch and was informed that Larson's license was suspended and that he had drug-related convictions on his record. Because of Deputy Morten's malfunctioning equipment and his inability to communicate over the radio, additional units were sent to assist him. The additional officers began arriving on the scene just as Deputy Morten was ending his phone call with dispatch.

[¶4] Deputy Morten returned to Larson's vehicle to inform him of his suspended license. As the deputy was speaking to Larson, two highway patrol troopers who had responded to the scene also began conversing with both of the passengers. Once Larson was informed of his suspended license, he expressed his belief that an executive order in response to Covid-19 had extended the expiration date of his license. Deputy Morten responded that the court would have to address that issue since his license was coming up as suspended within his record search. Larson asked Deputy Morten if he could still drive his vehicle home. Deputy Morten explained that he could not, because his license was suspended and both passengers denied having a valid driver's license with them. The passengers began to use their cell phones to locate someone who could drive them home. Deputy Morten then informed Larson that he would likely have Larson sign a promise to appear, but ended the second encounter by stating, "I will start figuring some stuff out to the best I can." Deputy Morten then stepped away from the vehicle and went on to have a two-minute conversation with the two troopers, who both expressed suspicion about the route and Larson's and the passengers' nervous behavior. The three reached a consensus that illegal contents were likely inside Larson's vehicle. They discussed the availability of a drug dog but determined there was not one in the area. The two troopers recommended that Deputy Morten require Larson to exit the vehicle to ask him additional questions. One of the troopers then left the scene. Deputy Morten returned to his patrol car and spent a minute fixing his lights before informing the remaining officers on the scene of his intent to remove Larson from the vehicle and place him in his patrol car to ask him further questions. Deputy Morten returned to Larson's vehicle and

asked him to step out of the vehicle. Upon his removal, Deputy Morten noticed a hypodermic needle sticking out of Larson's pocket. Deputy Morten removed the needle and placed Larson in his patrol car. Both Marsolek and Cruz were then removed from the vehicle, handcuffed, and placed in separate patrol cars.

[¶5]   After the occupants were removed, Deputy Morten walked around the vehicle and observed an open, empty alcohol bottle in front of the passenger seat. The officers then searched the vehicle and discovered more hypodermic needles and a pipe. A locked safe was also found underneath the passenger seat. All three occupants were informed of their *Miranda* rights while in separate patrol cars. Each occupant was asked about the safe. Marsolek initially denied knowledge of the safe, but later admitted ownership after Cruz told the officers the safe belonged to Marsolek. He gave Morten the safe's combination. Inside, needles and methamphetamine were found.

[¶6]   Marsolek moved to suppress the evidence resulting from the search. The district court denied the motion to suppress. Marsolek then entered a conditional guilty plea to possession of controlled substances and drug paraphernalia.

[¶7]   On appeal, Marsolek argues the scope of the stop was expanded once Deputy Morten ended his second encounter with Larson. He argues that once the deputy left Larson's vehicle, he had enough information to write a citation for three offenses: driving with a suspended license, care required for having an unrestrained passenger, and driving with an obstructed view. Instead of returning to his patrol car to issue the citation, Deputy Morten had a two-minute conversation with the troopers, discussing their suspicions about "something [being] in the car," followed by another minute spent fixing his malfunctioning lights. Marsolek argues these activities elongated the stop because they were not within the purpose of the traffic stop. Marsolek also argues that ordering Larson out of the vehicle also elongated the stop because it was a tactic to "glean information which would support reasonable suspicion for a search of the vehicle." Marsolek claims there was no reasonable suspicion to expand the traffic stop for an unrestrained passenger and an obstructed windshield into a drug investigation.

[¶8]  Our standard of review for a district court's decision on a motion to suppress is well established.

> In reviewing a district court's decision on a motion to suppress evidence, we defer to the district court's findings of fact and resolve conflicts in testimony in favor of affirmance. We will affirm a district court's decision on a motion to suppress if there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. Our standard of review recognizes the importance of the district court's opportunity to observe the witnesses and assess their credibility. Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law.

*State v. Stands*, 2021 ND 46, ¶ 7, 956 N.W.2d 366 (quoting *State v. Hawkins*, 2017 ND 172, ¶ 6, 898 N.W.2d 446).

[¶9]  This Court in *State v. Vetter* set forth the law on when a traffic stop becomes an unconstitutional seizure.

> Traffic violations justify a stop by police officers. When an officer seizes an individual for a traffic violation, it justifies a police investigation of that violation. Because a routine traffic stop is relatively brief, it is more like a "*Terry* stop" than an arrest. The time it takes to complete the "mission" of the stop, to "address the traffic violation that warranted the stop and attend to related safety concerns," is a permissible length of time to detain someone. However, a stop may not extend longer than the amount of time necessary to effectuate the purpose of the traffic stop. An officer's seizure of a person is permitted only until the tasks tied to the traffic infraction are—or reasonably should have been—completed. A traffic stop prolonged beyond the "time reasonably required to complete the stop's mission" is unlawful. Unrelated inquiries are permitted during a stop as long as they do not prolong the stop and extend the time the individual is detained. A stop may be prolonged only if the officer has reasonable suspicion to justify detaining the individual for inquiries unrelated to the stop.

2019 ND 138, ¶ 6, 927 N.W.2d 435 (cleaned up). Every person inside the vehicle is seized during a traffic stop. *State v. Addai*, 2010 ND 29, ¶ 17, 778 N.W.2d 555. Therefore, as a passenger in the stopped vehicle, Marsolek may challenge the constitutionality of a traffic stop. *Brendlin v. California*, 551 U.S. 249 (2007).

[¶10] During a lawfully-initiated traffic stop, the officer can conduct activities "related to traffic enforcement but not absolutely necessary to issuing a traffic ticket." *Vetter*, 2019 ND 138, ¶ 7. In addition to issuing a traffic citation, the officer can conduct the following activities:

> [R]equesting the driver's license and registration, requesting that the driver step out of the vehicle, requesting that the driver wait in the patrol car, conducting computer inquiries to determine the validity of the license and registration, conducting computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and making inquiries as to the motorist's destination and purpose.

*State v. Phelps*, 2017 ND 141, ¶ 10, 896 N.W.2d 245. An officer may also ask the passengers in the stopped vehicle similar questions "to confirm the information the driver provided." *State v. Asbach*, 2015 ND 280, ¶ 11, 871 N.W.2d 820. The traffic stop can continue "as long as reasonably necessary [for an officer] to conduct these activities." *State v. Fields*, 2003 ND 81, ¶ 8, 662 N.W.2d 242.

[¶11] In determining whether reasonable suspicion exists to justify prolonging a traffic stop, this Court looks at the totality of the circumstances while applying an objective standard. *State v. Cook*, 2020 ND 69, ¶ 16, 940 N.W.2d 605. "Whether the facts support a finding of reasonable articulable suspicion is a question of law, and thus, is fully reviewable by this Court." *State v. Adan*, 2016 ND 215, ¶ 9, 886 N.W.2d 841. The question for this Court is "whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity." *State v. Franzen*, 2010 ND 244, ¶ 12, 792 N.W.2d 533.

Reasonable suspicion is not easily reduced to a methodical set of legal rules, but it does require more than a "mere hunch." *Fields*, 2003 ND 81, ¶ 13.

III

[¶12] Marsolek argues Deputy Morten's activities after ending the second encounter with Larson were beyond the scope of the traffic stop, detouring into investigation of an unrelated crime, and thus unnecessarily delaying the stop. We agree with Marsolek that at the time Deputy Morten's second encounter with Larson had ended, his investigative duties relating to the traffic stop were completed. Deputy Morten had already requested the driver's license and registration from Larson, had requested identification from the passengers, had conducted an inquiry to determine the validity of Larson's driver's license and registration, had investigated Larson's criminal history to determine if Larson had outstanding warrants, and had made inquiries into Larson's destination and purpose. The sole task that remained to be completed was issuing the traffic citation. Instead of returning to his patrol car to do so, Deputy Morten expanded the stop into a drug investigation by having a two-minute conversation with the highway patrol troopers discussing their suspicions about "something [being] in the car." The district court found that "it was an informal conversation . . . thanking them for coming to the scene." The conversation did include thanks to the officers; however, the body camera footage clearly shows that the bulk, if not the entirety, of this conversation was spent discussing their suspicions about illegal contents inside the vehicle. Although the conversation lasted for only two minutes, we have rejected a *de minimis* time exception for extending a traffic stop. *Vetter*, 2019 ND 138, ¶ 16 (*citing Rodriguez v. United States*, 575 U.S. 348 (2015)). Even a 16-second extension of a stop may constitute an illegal seizure absent reasonable suspicion. *See id*. Because Morten's activities after ending the second encounter with Larson, including the two-minute conversation and ordering Larson out of the vehicle to ask him additional questions, were in furtherance of a drug investigation and not the suspended license, he had to have reasonable suspicion to support that new investigation.

6

[¶13] At the time Deputy Morten left Larson's vehicle after ending his second encounter with Larson, Deputy Morten knew the following: (1) Larson's nervous and evasive behavior; (2) Larson answering questions for the passengers; (3) the peculiarity of their route and their plans to "sightsee"; (4) Larson's prior drug convictions; and (5) Larson's downward motion toward the passenger seat upon pulling over. On the basis of these observations, Deputy Morten determined that reasonable suspicion existed to expand the stop into a drug investigation.

[¶14] Regarding factors one and two—nervous and evasive behavior and Larson answering questions on behalf of the passengers—we have held that these are "pertinent factor[s] in determining reasonable suspicion." *Adan*, 2016 ND 215, ¶ 15. Larson exhibited signs of nervous and evasive behavior from the very beginning of the traffic stop. Upon approaching Larson, Larson asked Deputy Morten "what's the problem?" When Deputy Morten asked the passengers for their identification, Larson quickly responded "what did they do?" Instead of the passengers responding that they did not have their IDs, Larson responded for them even though Deputy Morten's question was not directed to him. Larson then became fidgety and was observed constantly shifting his hands around. When Deputy Morten asked the passengers for their names, Larson started tapping his wallet around in his lap. After observing Larson's restless and anxious behavior, Deputy Morten even asked Larson whether he was okay, to which passenger Cruz answered for him, saying "he's a paranoid schizophrenic." On the basis of his training and experience, Deputy Morten made an "inference and deduction" that Larson was "extremely nervous [and] was evading certain questions." This "Court is mindful that a law enforcement officer is entitled to make an assessment of the situation in light of his specialized training and experience." *State v. Wills*, 2019 ND 176, ¶ 18, 930 N.W.2d 77 (internal citations omitted).

[¶15] The third factor relates to the vehicle's indirect route between Jamestown and Fargo. In *Wills*, this Court considered whether the driver's indirect route was a factor in determining reasonable suspicion. *Id*. at ¶ 15. In that case, we found that the record lacked "information supporting a guess that

7

the route was for an unlawful purpose" because the deputy did not ask further questions after the occupants stated their travel route. *Id*. Here, Deputy Morten asked a follow-up question after Larson stated their destination. Given that the vehicle was a few miles off the usual, direct route to their destination, Deputy Morten made further inquiry, asking "what are you doing in this area?" Further, unlike *Wills,* where there was no evidence presented regarding the occupants' indirect route, in this case evidence was presented at both the motion to suppress hearing and within Marsolek's supplemental brief regarding their indirect route between Fargo and Jamestown.

[¶16] The fourth factor to consider is Deputy Morten's knowledge of Larson's prior drug convictions. By itself, a person's criminal history is insufficient; however, when combined with other factors, "a person's criminal history can support a finding of reasonable suspicion." *Id*. at ¶ 16. Here, Deputy Morten learned from dispatch that Larson had several drug-related convictions on his record. Unlike *State v. Cook*, 2020 ND 69, ¶ 17*,* 940 N.W.2d 605, where the officer's knowledge of a prior drug conviction was the only basis for reasonable suspicion, Deputy Morten used Larson's prior conviction in combination with other factors in developing his reasonable suspicion that further unlawful activity was afoot.

[¶17] Finally, upon Larson's pulling over, Deputy Morten observed Larson reaching downward toward the passenger seat. At the motion to suppress hearing, Deputy Morten testified, "From what it looked like, it looked like he was reaching down and putting something underneath the seat instead of leaning over." Marsolek questioned his observation during cross examination on a theory that Larson instead was reaching for his registration card from the glove box. Deputy Morten responded that he observed downward motions and not cross motions. He stated that "[b]ecause you lean over into your glove box," a cross motion would have been made and "not . . . a downward motion" consistent with what he observed. Applying an objective standard, we find these "inferences and deductions" that Deputy Morten made regarding Larson's observed movements would "elude a layperson" to suspect that Larson and the passengers were engaged in further unlawful activity. *Fields*, 2003 ND

8

81, ¶ 13. In *Franzen*, the officer in that case testified that he observed a passenger "making furtive movements as if he was trying to conceal something underneath the front seat." 2010 ND 244, ¶ 2. We concluded that those movements, along with several other factors, established reasonable suspicion to expand the traffic stop into a drug investigation. *Id.* at ¶¶ 12, 16.

[¶18] Considering the totality of the circumstances, we conclude there was sufficient reasonable suspicion that Larson was engaged in criminal activity to continue to detain Larson, Marsolek, and Cruz after the initial purpose of the traffic stop had been completed. We disagree with the district court's finding that it was not until the needle was found in Larson's pocket that the scales tipped in favor of a finding of reasonable suspicion. Marsolek argues that the point at which Deputy Morten extended the stop was when he left Larson's vehicle for the second time and diverted into a drug investigation rather than completing the stop by writing a citation. At that point, Deputy Morten had enough information to issue a traffic citation but instead prolonged the stop on the basis of his knowledge of Larson's prior convictions and his observing movements consistent with concealing an object under the front passenger seat, witnessing Larson's "jumpy" and "evasive" behavior, and learning of their indirect route and suspicious sightseeing justification. We conclude these factors support the finding that there was "ample, competent evidence in the record . . . that raised reasonable suspicion" to expand the stop into a drug investigation. *State v. Deviley*, 2011 ND 182, ¶ 14, 803 N.W.2d 561. Reasonable suspicion had already been established prior to the time the needle was found in Larson's pocket. Thus, all of the subsequent activities Deputy Morten conducted after he left Larson's vehicle without returning to his patrol car to issue a citation, including the two-minute conversation with the troopers discussing their suspicions about illegal contents in the car and ordering Larson out of the vehicle to continue to question him, were supported by reasonable suspicion to justify prolonging the stop. The minute spent resolving equipment issues was a "negligibly burdensome precaution[] [taken] in order to complete his mission safely" because rebooting his lights to working order would help alert oncoming traffic of the stopped vehicles' presence. *Rodriguez*, 575 U.S. at 356. In conclusion, no Fourth Amendment violation occurred

because Deputy Morten had reasonable suspicion to justify detaining Larson, Marsolek, and Cruz for drug-related inquiries unrelated to the original purpose of the stop.

IV

[¶19] The district court did not err in denying Marsolek's motion to suppress the evidence resulting from the search of Larson's vehicle. We affirm the criminal judgment.

[¶20] Jon J. Jensen, C.J.
　　　Lisa Fair McEvers
　　　Jerod E. Tufte

　　　I concur in the result.

　　　Gerald W. VandeWalle
　　　Daniel J. Crothers